Argued March 25, affirmed April 8, 1919.

# SULLIVAN *v.* MURPHY.

## (179 Pac. 680.)

**Wills—Validity—Partial Intestacy.**

1.  It is not essential to the validity of a will that it should dispose of all of the property of the deceased, but a single bequest, however small, would be valid if no other property were disposed of.

**Wills—Validity—Revocation.**

2.  A will would be entirely valid if it effected nothing more than the revocation of a former will.

   [As to revocation of wills, see notes in 45 **Am. Rep.** 338; 23 **Am. St. Rep.** 344.]

From Multnomah: ROBERT TUCKER, Judge.

Department 2.

This is a contest brought by the residuary legatee, and principal beneficiary, of a former will, against a later one revoking the first and leaving the deceased intestate as to the property, which had previously been given to the contestant, thereby leaving the same to be distributed among the relatives of the deceased, according to law.

The deceased woman, Bridget Ginty, died on May 26, 1915. On the first day of March, preceding her death, she executed the will under which contestant claims, giving small bequests to some of her relatives, but bequeathing the bulk of her property to Alexander Cestelli, the contestant herein, for charitable purposes.

On the fourteenth day of May, 1915, she executed another will, expressly revoking the former will but making practically the same specific bequests, that she had made in the preceding will, excepting that the bulk of her property, amounting to nearly $20,000, which had been bequeathed in the previous will to Cestelli, was not, in the later will, distributed at all, but left

to descend to her relatives, entitled to inherit under the law.

The later will was admitted to probate as her last will and testament, on July 27, 1915. Afterwards this contest was brought by Cestelli, in the County Court for Multnomah County, and after due proceedings the contest was dismissed and the will sustained. Thereafter, the cause was appealed to the Circuit Court, wherein the will was again sustained. From this decision this appeal is taken.

At the time of her death the deceased was well past middle life, and bordering on old age. Her husband had died many years before, leaving her with two sons, both of whom died a short time before the wills in question were executed; leaving her without any children or lineal descendants. Her nearest, and apparently her only relatives, were a brother and sister and the children of her sister. The deceased was an illiterate woman, unable to read and write, and both of the wills were executed by her mark.    AFFIRMED.

For appellant there was a brief over the names of *Mr. M. E. Crumpacker, Mr. Albert B. Ferrera* and *Messrs. Emmons & Webster,* with an oral argument by *Mr. Crumpacker.*

For respondents there was a brief over the names of *Mr. Lawrence A. McNary* and *Mr. Edward H. Cahalin,* with an oral argument by *Mr. McNary.*

BENNETT, J.—It is urged on behalf of appellant that the last will is invalid because, as is alleged, it did not express the real intention of Mrs. Ginty, as to the disposition of the bulk of her property, but left it to be distributed at law, between her brother and sis-

ter. It is claimed she did not wish to have any of the property go to her brother and sister, and that if she had understood that that would be the effect of her last will, she would never have made it.

The evidence is by no means satisfactory or conclusive, as to what her real intention or wishes were in that regard. Father Cestelli was an Italian priest, and the testimony of himself and the two witnesses to the first will, who were procured by him, and who were also Italians, tend to show a very bitter feeling, amounting almost to dislike and hatred, on the part of Mrs. Ginty toward her brother and sister—especially toward the brother. In this the evidence is to some extent corroborated by Mr. Cahalin, the attorney who drew the last will for Mrs. Ginty.

On the other hand, the testimony of Mrs. Ginty's brother and Mrs. Conway and Mrs. Richardson, who were disinterested witnesses, and Father Cronin, a Catholic priest, who frequently visited Mrs. Ginty during this time, was strongly to the effect, that the relations between Mrs. Ginty and her brother and sister were generally warm and kindly—that she and her brother were constantly corresponding through the intermediation of other parties—Mrs. Ginty being unable to write herself—and that her brother, at her urgent request, came up from California to stay with her about the time, or shortly after, the first will was drawn. There is no evidence whatever that she had any unkind feelings toward the children of her sister.

The will was drawn by a reputable attorney, and there is no evidence, nor even a suggestion, that she was not entirely in her right mind, and in possession of all her faculties, at the time the latter will was drawn. Mr. Cahalin, the attorney, had several talks with her about the terms and conditions of the pro-

posed will on several different days, before the will was finally drawn. On the occasion of the first talk with him, Mrs. Ginty expressed herself quite forcibly to the effect that she did not want to give her brother and sister any of her property. This was while her brother was there, and on the day he left to return to his home in San Francisco. After this in the ensuing talks she said nothing in regard to her brother and sister, or as to the disposition of the remainder of her property.

Unfortunately, Mrs. Ginty was addicted to the use of intoxicating liquor; and her troubles and sorrows had, no doubt, made her weaker against temptation than usual, in that respect. It is suggested on the part of the proponents of the will that Father Cestelli had been furnishing her with liquor, upon which she frequently became intoxicated. He admits he gave her liquor at different times during this period, but not in sufficient quantity to produce intoxication. Her brother claims he had remonstrated with her about her habit of drinking to excess, and that this was the reason why she expressed herself to Mr. Cahalin as she did, at the time he first talked with her about the will, and it is contended on the part of proponents that the feeling against her brother and sister, and especially against her brother, was a temporary one, arising on this account, and which had passed away and been dissipated, before the will was finally drawn.

In any event, we cannot believe there is anything in the facts and circumstances surrounding the transaction which would justify a court in setting the will aside. We cannot know, since her lips are closed, what was the motive causing Mrs. Ginty to leave the bulk of her property undisposed of. It seems apparent, from the evidence, that her mind was in a state of uncer-

tainty as to what she should do with the greater part of her belongings. It is plain she was not satisfied with the previous disposition of it, and that, on the other hand, she had not made up her mind to give it to her relatives. It is as likely a theory as any that she was holding the disposition of the remainder of her property in abeyance, until the time when she should make up her mind as to its disposal. She was not a very old woman and could reasonably expect to outlive both her brother and sister, who were much older than she.

Although she was illiterate, the witnesses on both sides agree that she was a very keen, shrewd woman. It is not likely that such a woman could live to her age without knowing that if she died without making any disposition of this property, it would go to her relatives. We must also assume that she understood perfectly that her second will revoked the previous one. Indeed, there is much evidence tending to show, that this was one of the chief motives on her part for making the latter will.

1, 2. Of course it is not necessary, in order to make a will valid, that it should dispose of *all* of the property of the deceased. A single bequest, however small, would be valid if no other property were disposed of. Indeed, there can be no question but what a will simply revoking a previous will would be entirely valid.

It may be that in this case the law will make a different disposition of the bulk of Mrs. Ginty's property than she would have made, if she had made any. As to that we cannot say, and if we could, it would make no difference, for in the absence of a will, or in the absence of the distribution of any particular property by will, it is distributed by law without regard to the wishes of

the deceased.    Oftentimes it is disposed of very differently from the wishes of the decedent.

We think the decisions of the County Court and of the Circuit Court were right and must be affirmed.

AFFIRMED.

McBRIDE, C. J., and BEAN and JOHNS, JJ., concur.